AO 106 (Rev. 04/10)  Application for a Search Warrant

*Chrisie Prast* 2/8/23
AUTHORIZED AND APPROVED/DATE:

*AMG 2/8/23*

# UNITED STATES DISTRICT COURT

for the

Western District of Oklahoma

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

AN APPLE IPHONE 13, DARK BLUE IN COLOR,
MODEL: A2482, IMEI: 359673350157831, CURRENTLY
LOCATED AT THE HSI OKLAHOMA CITY OFFICE

)
)
)
)
)
)

Case No. M-23-56-AMG

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the _____Western_____ District of _____Oklahoma_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Drug Conspiracy |
| 21 U.S.C. § 841 | Possession of a Controlled Substance With Intent to Distribute |

The application is based on these facts:
See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

RYAN BELCHER, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **February 8, 2023**

City and state:  Oklahoma City, Oklahoma

_____
*Judge's signature*

AMANDA MAXFIELD GREEN, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

IN THE MATTER OF THE SEARCH OF
AN APPLE IPHONE 13, DARK BLUE IN
COLOR, MODEL: A2482,
IMEI: 359673350157831, CURRENTLY
LOCATED AT THE HSI OKLAHOMA
CITY OFFICE

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A WARRANT TO SEARCH AND SEIZE

I, Ryan Belcher, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession and further described in Attachment A, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with Homeland Security Investigations ("HSI") and have been so employed since April 2015.  I am presently assigned to the HSI office in Oklahoma City, Oklahoma (hereinafter referred to as HSI Oklahoma City).

3.      I am an investigative or law enforcement officer within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. §

2516. I am authorized to conduct criminal investigations of violations of the laws of the United States and to execute warrants issued under the authority of the United States.

4.      I have been involved in a wide variety of investigative matters. Among other responsibilities, I am responsible for conducting investigations into violations of federal criminal laws, including the manufacturing and possession of controlled substances with the intent to distribute.  I have received approximately 24 weeks of specialized training at the Federal Law Enforcement Training Center in the enforcement of federal laws.  I have arrested, interviewed, and debriefed numerous individuals who have been involved and have personal knowledge of transporting and concealing narcotics, as well as, the amassing, spending, converting, transporting, distributing, money laundering and concealing of proceeds from illegal drug trafficking and smuggling.  I have participated in numerous investigations involving physical and electronic surveillance. I have testified in judicial proceedings concerning the prosecution for violations of laws related to the smuggling and trafficking of contraband, including controlled substances. I have been the affiant and participated on numerous federal search warrants.

5.      The facts in this Affidavit are based upon my personal observations, my training and experience, reports provided to me by other law enforcement officers, and statements made by witnesses and other concerned parties.  Since this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, I have not included each and every fact known to me concerning this investigation.

2

6.      The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7.      The property to be searched is an **Apple iPhone 13, dark blue in color, Model: A2482, IMEI:  359673350157831**, hereinafter the "Device."  The Device is currently located in secure evidence storage at the HSI Oklahoma City office.   The Device is described in more detail in **Attachment A** hereto.  Based on the facts set forth below, I believe there is probable cause to believe that the Device contains evidence of violations of 21 U.S.C. § 841(a)(1), Possession of a Controlled Substance With Intent to Distribute, and 21 U.S.C. § 846, Drug Conspiracy, as described further in **Attachment B** (description of items to be seized).

8.      The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in **Attachment B.**

## PROBABLE CAUSE

9.      Homeland Security Investigations (HSI), the Oklahoma Bureau of Narcotics (OBN), and the Lawton Police Department (LPD) are currently conducting a joint investigation targeting Isaiah Clinton McGill (MCGILL), a cocaine distributor who operates primarily out of Lawton, Oklahoma but has distribution activities that extend through at least Oklahoma City, Oklahoma and likely up to Missouri.  The investigation

3

began in mid-2021, and through the use of a Title III wiretap investigation, cooperating defendants, undercover agents (UC), pole cameras, controlled purchases, Facebook search warrants, pen registers with trap and trace capabilities, ping warrants, GPS trackers on automobiles, and subpoenas for financial documents, agents have confirmed that MCGILL does in fact distribute cocaine. From January 2022 through November 2022, HSI and OBN conducted nine (9) controlled purchases of cocaine from MCGILL primarily at the businesses he owned throughout Lawton, Oklahoma (BLVD smoke shops and the Dragon West topless nightclub).

10.     On November 7, 2022, Homeland Security Investigations (HSI) presented and was later granted, through United States District Judge for the Western District of Oklahoma Bernard Jones, an order authorizing the interception of wire communications for (580) 678-4101 (TT1). Through this investigation, to include controlled purchases of trafficking amounts of cocaine, HSI knows phone number (580) 678-4101 to be used by MCGILL.

11.     During this investigation, it was discovered that SAMMY FOSTER was a co-conspirator in trafficking cocaine and other illegal substances for MCGILL and other subjects not known to law enforcement. Furthermore, law enforcement confirmed phone number (580) 458-2200 was subscribed to MGILL, but used by FOSTER. Throughout the interception of the (580) 678-4101, FOSTER was regularly intercepted using (580) 458-2200.

12.     On November 12, 2022, while monitoring TT1, at approximately 1221 hours, MCGILL received an incoming voice call from FOSTER, using (580) 458-2200

4

(Ref. Session 0168). FOSTER asked MCGILL, "Bro, was that message for me?" There seemed to be some confusion about him [FOSTER] receiving a message from MCGILL, but FOSTER advised that he was at his house. Later that same day, at approximately 1252 hours, MCGILL received an incoming voice call from FOSTER (580) 458-2200, (Ref. Session 0169). MCGILL asks FOSTER "Hey, do you need that other thing too... or you want to wait till later?" FOSTER replied, "If you want to bring it to me, bring it to me. I don't really give a shit. I'm not, uh, I'm not mov, we're not [stammers] I'm, I'm-yeah, I'm moving that tomorrow, fuck, I'm trippin! I'll pay you in the morning. Yeah, I need it!" FOSTER adds, "Oh god, I would have heard it when I got there, cause that's really all he wants." FOSTER goes on to say "Yeah, he's just taking these motherfucking vapes." FOSTER further states, "We're gonna have the whole thousand (1,000) done today." Through this investigation it was discovered that FOSTER was manufacturing THC (marijuana) vape cartridges to distribute in another state. Through this conversation, FOSTER expresses he was glad that MCGILL reminded him because that was all "he" really wanted (referring to an unknown third party male). MCGILL advised FOSTER, he would go get it today. It was later discovered that FOSTER traveled to Missouri, where he delivered the package along with the vape cartridges he made. Investigators believe that the reference to the "other thing" was code for cocaine, (see *infra*, p. 7, ¶ 17), and that they were also referencing the THC (marijuana) vape cartridges.

13.     Later that same day, while conducting surveillance at approximately 1258 hours, investigators observed MCGILL arrive at FOSTER'S residence located at 2101

SW 38th Street, Lot 90, in his 2022 silver Chevrolet Silverado known to display Oklahoma license plate MLA680. Investigators observed MCGILL carrying a black bag as he walked inside FOSTER'S residence.

14.     At approximately 1400 hours, investigators observed MCGILL walk out of FOSTER'S residence carrying what then appeared to be an empty bag. MCGILL entered his 2022 silver Chevrolet Silverado (MLA680) and departed the area.

15.     On November 13, 2022, FOSTER departed Lawton, OK to an unknown destination. It was later determined FOSTER had traveled to Missouri. While in transit to his destination, FOSTER had a flat tire traveling north on I-35 near Edmond, OK. While monitoring the court authorized phone intercepts of TT1, details of the flat tire event were captured in numerous phone calls between FOSTER, using (580) 458-2200, & MCGILL. In session 00302, FOSTER tells MCGILL he had a blowout and provided his location to MCGILL along I-35 and Seward Road exit. MCGILL tells FOSTER he will send a tow truck to assist. FOSTER responds, "Ah man, damn how long, ah, I've got all this shit in my trunk." Later, in session 00306, FOSTER advises MCGILL, "Hey, I'm limping off the road bro, ca-uh, 'cause I don't want a cop pulling off behind me being on federal probation and then search my car." MCGILL responds, "Yeah, yeah, yeah, yeah, yeah, do that." In session 00311, FOSTER tells MCGILL a highway patrolman [OHP Trooper] pulled in behind him while changing his tire and quickly details their encounter. FOSTER quickly gets off the phone to leave the area and meet his son.

16.     In session 00325, FOSTER provides additional details of the encounter with the OHP Trooper.  FOSTER tells MCGILL he changed cars with his son and is headed north, back towards his destination.  FOSTER explains how the OHP Trooper provided him with a car jack to assist with the flat tire.  FOSTER tells MCGILL, "He said... all that shit was on the back seat of my car bro.  Because I had to get the tire out of the trunk, right."  Investigators believe what FOSTER is referring to in his back seat are the cocaine and THC vape cartridges the two men discussed the day before.  FOSTER continues, "And he's standing next to my fucking car.  Luckily my fucking back windows are so fucking black.  He can't even look in 'em.  He said, "Is there anybody in that car?" I said "no sir."  FOSTER expressed his concern about the OHP Trooper looking inside the car.  Later in the call, FOSTER and MCGILL discuss a woman FOSTER is dating. MCGILL advises FOSTER to stop seeing her because she still uses methamphetamine and he [FOSTER] is on probation and could relapse by spending time with her.  FOSTER acknowledged being involved with the woman isn't good for him.

17.     Later that same date, at approximately 2056 hours, FOSTER calls MCGILL (Ref. Session 0329).  FOSTER tells MCGILL, "Hey bro, Hippie [PH] wants to come see you... for a ball."  MCGILL asks, "Okay. Is he here?"  FOSTER responds, "No, he's got, he's in Norman [PH] but he, he said "man, can you get it to Norman.  I said no, bro, I'm in fucking Missouri right, now."  FOSTER goes on to say there is no way he can help "Hippie," but coordinates a deal with MCGILL to have "Hippie" go to him in Lawton. Based on their training and experience, investigators know the term "ball" is short for "8

7

ball," which is slang commonly referring to eight ounces of cocaine. The details of this conversation illustrate how FOSTER was involved in the coordination and delivery of cocaine on behalf of MCGILL.

18.     On November 14, 2022, at approximately 1110 hours, MCGILL received an incoming voice call from FOSTER (Ref. Session 0592). MCGILL asked FOSTER if he was back in town, referring to Lawton, Oklahoma. FOSTER advised MCGILL that he would return to town at approximately 4:30pm. FOSTER tells MCGILL, "Well, I'm uh... bringing you back sixty (60)." MCGILL responds, "Okay, bud."  FOSTER continues, "And uh, I'm supposed to bring a lot more back... this weekend when I come back from Kentucky. I'm just gonna deliver them, bro."

19.     Later that same date, at approximately 1719 hours, investigators observed MCGILL arrive at FOSTER'S residence (2101 SW 38th St. Lot 90) and exit his 2022 silver Chevrolet Silverado (MLA680) only carrying his cellular phone in his hand. Shortly thereafter, at approximately 1729 hours, investigators observed MCGILL exit FOSTER'S residence with what appeared to be a backpack. MCGILL entered his Chevrolet Silverado and departed the area.

20.     Later that same date, at approximately 1925 hours, MCGILL received an incoming voice call on TT1 from an unknown male subject through phone number (816) 205-1751 (hereinafter UM1751) (Ref. Session 1592). MCGILL and UM1751 begin the conversation about how everything is going.  UM1751 tells MCGILL, "Sam [FOSTER] got a backpack full of money you need to go get, though. As soon as you can." MCGILL

8

responds to UM1751, "Yeah, yeah. Yeah, I already got it," and confirmed that FOSTER already gave it to MCGILL.

21.    UM1751 asked MCGILL "Alright, alright. Where we at on the money? Is that-where, where is that?" UM1751 added, "You took the sixty (60) off of the one fifty-five (155) that and we still got some of that, right? UM1751 continued and asked MCGILL, how much money they were totaling right now. MCGILL replied, "So, you just brought-he just gave me sixty (60), right?" referencing the "60" FOSTER gave him earlier that day. The two men continue the conversation about business issues they are both involved in.

22.    Through this investigation and observations made during these communications, investigators believe the numbers "60" and "155" are referencing sixty thousand dollars ($60,000), one hundred and fifty-five thousand dollars ($155,000). With MCGILL and FOSTER known to traffic cocaine, it is suspected that this money was in exchange for cocaine and other illegal items, such as marijuana and related marijuana products.

23.    On November 18, 2022, calls intercepted on TT1 between MCGILL & FOSTER verified FOSTER was traveling thru Missouri. In session 3422, FOSTER tells MCGILL he was involved in a traffic stop conducted by Missouri Highway Patrol and he [FOSTER] refused a consensual search of his car. During the call, FOSTER tells MCGILL that he [FOSTER] told the Trooper he was traveling to Bowling Green. FOSTER and MCGILL discuss taking an alternate route when he returned to Oklahoma

and that he [FOSTER] would be returning with cash. Later that same evening, in session 3485, FOSTER tells MCGILL he attempted to contact someone they know who lives in Branson, Missouri. FOSTER goes on to explain the reason for that call was to create a false story to provide to his Probation Officer to legitimize a reason to be in Missouri, which was a violation of his probation.

24. On November 19, 2022, FOSTER calls MCGILL (Ref. Session 03820) and tells MCGILL he [FOSTER] needs to know what it goes for a pound. MCGILL tells FOSTER that if they sell it for $5 a gram, then the price comes out to be $2,200. The two men go on to discuss how the price can depend on the situation. They discuss how selling for too low of a price keeps them from making profit, but if they sell for too high of a price, then potential customers may not want to purchase from them. Considering the nature of this call, the amount of product detailed, and the price, investigators believe the two men are referring to a marijuana by-product such as cannabis wax.

25. Later that same date, at approximately 2353 hours, MCGILL and FOSTER speak again. During that call, FOSTER tells MCGILL he is in Nashville and won't be leaving until the next day. FOSTER also states, "I had to go and pickup some more cash and [U/I]."

26. On November 20, 2022, at approximately 1128 hours, FOSTER calls MCGILL (Ref. Session 4004). During that call, FOSTER tells MCGILL he met someone the previous night who wanted to buy marijuana from him. FOSTER continues the conversation explaining to MCGILL how this person is involved in marijuana and "ice."

Through training & experience, investigators know the term "ice" is a common slang term used when referring to crystal methamphetamine. FOSTER adds how this person will sell him one kilogram of "ice" for four thousand dollars ($4,000). FOSTER continues by telling MCGILL how this person won't work with anyone but family but since he [FOSTER] was brought there by someone, then he was considered family. This conversation illustrates how FOSTER is involved with at least one individual who is selling kilogram quantities of crystal methamphetamine.

27.     Later that same date, at approximately 1640 hours, FOSTER was traveling back to Lawton, OK and was stopped by a Roland Police Department (RPD) Officer in Roland, OK for a traffic violation. HSI has since received a copy of the report documenting the traffic stop from RPD. During the traffic stop, the RPD Officer identified FOSTER as the driver and lone occupant of the vehicle. During the traffic stop, the Officer asked FOSTER if he was concealing any drugs, firearms, or money in the vehicle. FOSTER denied having any of those items in the vehicle. FOSTER was issued a warning by the RPD Officer for the traffic violation. The Officer asked FOSTER if he would consent to a K-9 free air sniff of the vehicle. FOSTER agreed and consented to the K-9 deployment around the exterior of the vehicle. The RPD K-9 was then deployed and conducted a free air sniff of the exterior of the vehicle. The K-9 alerted to the odor of illegal drugs coming from the vehicle. The Officer conducted a search of the vehicle and discovered a large sum of U.S. currency in a plastic bag, hidden

in the trunk of the vehicle underneath the spare tire. The RPD later determined that the U.S. currency totaled $25,000.

28.     Based on my training and experience, I am aware that hiding large sums of currency in a vehicle is indicative of bulk cash smuggling. Bulk cash smuggling is commonly associated with the smuggling or distribution of illegal drugs. In this instance, FOSTER was driving from Kentucky to Oklahoma, with a large sum of cash, which was hidden beneath the spare tire, and wrapped in plastic. Taking all the facts into consideration, it is believed FOSTER was returning from Kentucky with the money to give to MCGILL resulting from a drug transaction. On the evening of November 20, 2022, calls intercepted on TT1 between MCGILL & FOSTER documented events of the arrest of FOSTER by RPD.

29.     These calls illustrate the level of involvement FOSTER had with MCGILL and others, known and unknown by law enforcement to possess and controlled substances illegally. Furthermore, the information provided in this affidavit reinforces how FOSTER was conspiring with MCGILL and others to distribute illegal drugs and has used or is using his home residence to store illegal drugs (cocaine and marijuana), as well as U.S. Currency (the proceeds from illegal drug sales), and other items of drug paraphernalia (such as cannabis wax and THC vape cartridges).

30.     While monitoring TTI on December 8, 2022, at approximately 1006 hours, investigators observed MCGILL receive a phone call from (580) 458-2200. There was no answer, and no voice message was left during this call. (580) 458-2200 was the

primary phone number used by FOSTER for most phone calls involving him during the interception of TT1. The only phone calls intercepted where FOSTER did not use that phone number were when he was arrested by Roland PD and his phone was seized. Subsequent to that arrest, FOSTER continued to use that phone number, which was documented in additional phone calls during the interception of TT1.

31.     Later that same date, U.S. Probation officer(s) took FOSTER into custody for multiple violations of his federal probation at Western District of Oklahoma case number CR-19-287-G and discovered FOSTER had in his possession an Apple iPhone 13, model A2482, dark blue in color, bearing IMEI number 359673350157831. U.S. Probation secured this phone and later turned it over to HSI.

32.     On that same date, at approximately 1147 hours, MCGILL received a phone call from Dakota Foster, FOSTER'S son. Dakota Foster advised MCGILL that FOSTER had been arrested by his probation officer. Dakota Foster told MCGILL his dad called him from the courthouse and asked him to come get his keys, wallet and his car. Taking all the events of December 8, 2022 into consideration, investigators believe the phone FOSTER had in his possession when he was arrested by U.S. Probation officer(s) is the same phone that utilizes phone number (580) 458-2200.

## BACKGROUND REGARDING CELLULAR DEVICES

33.     Based upon my training and experience, I am aware that individuals involved with drug trafficking of large quantities are often involved in smuggling drug proceeds. These individuals often use cell phones and other similar electronic devices, such as tablets, and computers to maintain contact with other co-conspirators, including

13

suppliers, transporters, distributors, and purchasers of illegal drugs. Such devices and their associated memory cards commonly contain electronically stored information which constitutes evidence, fruits, and instrumentalities of drug trafficking offenses including, but not limited to, the phone directory and/or contacts list, calendar, text messages, e-mail messages, call logs, photographs, and videos. Based upon my training and experience, I know that most drug trafficking—and particularly high-level drug trafficking—is coordinated via cell phones and similar electronic devices. Conspirators use these devices to, *inter alia*, make requests for drug purchases, provide information on price, and set up places to meet for transactions. Consequently, the cellular telephones and similar electronic devices of individuals involved in this drug conspiracy will likely contain evidence of such illegal activity. Therefore, I submit that there is probable cause to believe that the **Device** was used in furtherance of this drug-trafficking conspiracy and will contain evidence of the same.

## TECHNICAL TERMS

34.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.    Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone

14

number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can

also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses,

while other computers have dynamic—that is, frequently changed—IP addresses.

g.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

35.    Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, internet outlet with IP Address, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

36.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

37.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.

18

There is probable cause to believe that this forensic electronic evidence might be on the Device because:

h.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

i.  Forensic evidence on a device can also indicate who has used or controlled the Device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

j.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

k.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on the Device is evidence may depend on other information stored on the Device and the application of knowledge about how the Device operates. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

l.  Further, in finding evidence of how a Device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

38.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Device consistent with the warrant.   The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

39.     *Manner of execution.*   Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.   Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

40.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

RYAN BELCHER
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me on *February 8* , 2023.

AMANDA MAXFIELD GREEN
United States Magistrate Judge

21

## ATTACHMENT A

The property to be searched is described as an **Apple iPhone 13, dark blue in color, Model: A2482, IMEI: 359673350157831, hereinafter** referred to as the "Device." The Device is currently located in secure evidence storage at the HSI Oklahoma City office. This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.



| a. Apple iPhone 13, IMEI: 359673350157831 |
|---|

## ATTACHMENT B

### Particular Things to be Seized

All evidence relating to violations of 21 U.S.C. § 841(a)(1) (possession of a controlled substance with intent to distribute) and 21 U.S.C. § 846 (drug conspiracy), including but not limited to:

a. Any and all images, videos, and any other digital media content of Sammy FOSTER and/or his co-conspirators, relating to assets or proceeds derived from the sale of illegal drugs or illegal drugs;

b. call logs, address books, GPS data, internet access, IP accounts, text messages, and email accounts;

c. lists of customers and related identifying information;

d. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

e. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

f. any information recording FOSTER's schedule or travels from November 01, 2021, to December 9, 2022;

g. all bank records, checks, credit card bills, account information, and other financial records.

2. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.      Records documenting the use of the Internet Protocol addresses to communicated with e-mail servers, internet sites, and social media, including:

    a.  records of Internet Protocol addresses used;

    b.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

4.      This warrant authorizes a review of electronic storage media seized, electronically stored information, communications, other records and information seized, copied, or disclosed pursuant to this warrant in order to locate any evidence, fruits, and instrumentalities of violations of the above-listed federal criminal statutes. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, HSI may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.